UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,              CASE NUMBER: 07-20037
                                            HONORABLE VICTORIA A. ROBERTS

v.

D-2    MICHAEL G. PANYARD,

                Defendant.

_____/


**ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL**


**I.    INTRODUCTION**

      Defendant Michael Panyard moves for Judgment of Acquittal on all counts

pursuant to Federal Rule of Criminal Procedure 29.  For the following reasons,

Defendant's motion is **DENIED**.

**II.    BACKGROUND**

      The Clean Water Act ("the Act") prohibits the discharge of pollutants into United

States waters through publicly owned treatment works, except in accordance with a

National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to

the Act.  33 U.S.C. §§ 1311(a), 1317(b)(1), 1342.  The Act allows states to set up and

manage their own NPDES programs, contingent on approval by the Environmental

Protection Agency ("EPA"), and to license qualified wastewater treatment facilities to

pretreat certain types of waste.  § 1342(b).   The Michigan Department of Environmental

Quality ("MDEQ") administers the state's EPA-approved NPDES program.  MDEQ

authorizes local agencies like the Detroit Water and Sewerage Department ("DWSD") to issue discharge permits to local operators and to enforce federal pretreatment standards locally. *Id.* At all times, the federal government maintains the authority to prosecute knowing violations of "any requirement imposed in a pretreatment program approved under [§ 1342(a)(3) or (b)(8)] of this Act." § 1319(c)(2)(A).

Comprehensive Environmental Solutions, Inc. ("CESI") operates an industrial waste treatment, storage and disposal facility in Dearborn, Michigan. Clients pay CESI to treat their industrial wastewater, removing oils and other substances so that it may legally be discharged into the municipal sewer. The company, which is now under new management, pleaded guilty to related charges in September 2008, and entered into a consent order with MDEQ to clean the facility and properly dispose of wastes stored on-site.

Between January 2001 and June 2002, Defendant held various positions at CESI, including that of environmental coordinator and head of sales. During the relevant period, CESI operated under a permit from DWSD which mandated that liquid industrial wastes be treated according to a multi-step process before being discharged into the municipal sewer system. (Gov't Ex. 1.04 at 11.)

On June 17, 2002, federal and state law enforcement agents raided CESI on suspicions that the facility dumped untreated wastewater directly into the sewers. A grand jury indicted Defendant and two other CESI managers. On October 21, 2008, after a three week trial, a jury convicted Defendant of bypassing Clean Water Act pretreatment requirements (Count II); rendering inaccurate DWSD monitoring devices or methods (Count IV); making false statements (Counts V-VIII, X and XII); and

2

conspiring to commit all the above (Count I).

At the conclusion of the Government's case, Defendant filed a Rule 29(a) Motion and Brief for Judgment of Acquittal with respect to Counts II, IV and VII (Doc. #61, hereinafter "Def.'s Br. I").  On October 15, the Court heard oral arguments on the motion, reserved its decision and submitted the case to the jury.  After the jury's verdict, Defendant filed a Rule 29(c) Motion and Brief for Judgment of Acquittal on all counts, which incorporated arguments made orally and in his earlier Rule 29(a) motion (Doc. #69, hereinafter "Def.'s Br. II").

## III.   ANALYSIS

A motion under Fed. R. Crim. P. 29 is a challenge to the sufficiency of the evidence to sustain a conviction.  *U.S. v. Jones*, 102 F.3d 804, 807 (6th Cir. 1996).  When addressing such a motion, whether made under 29(a) or (c), the trial court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *U.S. v. Webber*, 208 F.3d 545, 553 (6th Cir. 2000).  "A defendant making such a challenge bears a very heavy burden."  *Webber*, 208 F.3d at 553 (*quoting U.S. v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999)).

On appeal, the denial of a Rule 29 motion is reviewed *de novo*, but the trial court's findings of facts are reviewed for clear error.  *U.S. v. Al-Zubaidy*, 283 F.3d 804, 808 (6th Cir. 2002).  The Sixth Circuit will affirm a district court's decision "if the evidence, viewed in a light most favorable to the government, 'would allow a rational trier of fact to find the defendant guilty beyond a reasonable doubt.'"  *Id. (quoting U.S. v.*

*Canan*, 48 F.3d 954, 962 (6th Cir. 1995)).  The appeals court "may conclude a conviction is supported by sufficient evidence even though the circumstantial evidence does not remove every reasonable hypothesis except that of guilt."  *Jones*, 102 F.3d at 807 (*quoting U.S. v. Clark*, 928 F.2d 733, 736 (6th Cir. 1991) (per curiam)) (other internal quotations omitted).

The Court reviews Defendant's argument on each count in order, except for Count I (conspiracy to commit the other offenses), which is considered last.

**A.    Count II: Violation of the Clean Water Act – Bypass**

Count II accuses Defendant of knowingly violating the Clean Water Act, 33 U.S.C. § 1319(c)(2)(A), by bypassing CESI's pretreatment system and discharging wastewater directly into the municipal sewer system.  Defendant does not contend that the Government failed to present sufficient evidence to convict him; however, he argues the federal government has no jurisdiction to prosecute the bypass of CESI's pretreatment program.

The Government replies that this is a legal argument beyond the scope of a Rule 29 motion.  In any case, the Government argues, the pretreatment program created by DWSD was approved by the EPA pursuant to the Clean Water Act, and thus federal agencies are empowered to enforce its bypass prohibitions.  Before addressing the merits of Defendant's argument, the Court considers whether it is proper in the context of a Rule 29 motion.

There is little case law on whether legal arguments can be considered as part of a Rule 29 motion.  The Government cites no authority for its contention that the Court should dismiss Defendant's argument out of hand, but the Court found one case to the

4

contrary.  In *U.S.v. Frumento*, the defendants were state employees convicted of

violating a federal law prohibiting someone associated with an "enterprise" affecting

interstate commerce from engaging in racketeering activities.  426 F. Supp. 797, 801

(E.D. Pa. 1976).  The defendants moved for judicial acquittal on grounds that their

employer, a state agency, was not an "enterprise" within the meaning of the statute.  *Id.*

at 802.  The court held:

> Defendants improperly designated this argument as a ground for a
> judgment of acquittal pursuant to Fed. R. Crim. P. 29.  The sole foundation
> upon which a judgment of acquittal should be based is a successful
> challenge to the sufficiency of the Government's evidence.  The
> "enterprise" argument actually constitutes a motion for arrest of judgment,
> pursuant to [Fed. R. Crim. P. 34], and this Court shall treat it accordingly.

*Id.* at 802 n.5 (internal citation omitted).  As the Supreme Court explains, a Rule 29

motion differs from one under Rule 34 in that:

> [t]he former is entered "if the evidence is insufficient to sustain a
> conviction" of the offense charged, while the latter is granted where the
> indictment "does not charge an offense" at all.  . . .  If [a judge] grants [a
> Rule 29] motion, the defendant stands acquitted, but . . . only because the
> evidence has been found insufficient to support the charge.  Where the
> grounds for granting an "acquittal" are based on an independent legal
> decision about the interpretation or construction of the statute, the judge's
> action will be an "arrest of judgment". . .

*U.S. v. Sisson*, 399 U.S. 267, 320-321 (1970) (Burger, C.J., dissenting) (*citing U.S. v.*

*Waters*, 175 F.2d 340 (D.C. Cir. 1948)).

Without Sixth Circuit guidance on this issue, the Court finds the *Frumento*

approach persuasive and treats Defendant's argument as a Rule 34 motion.

A court may arrest judgment if "(1) the indictment or information does not charge

an offense; or (2) the court does not have jurisdiction of the charged offense."  Fed. R.

Crim. P. 34(a).

> A motion to arrest judgment under Rule 34 must be granted if substantive defects exist in the indictment or information, such that an offense is not charged, or if the court lacked jurisdiction over the case. "Motions for this relief are rarely made, and it is even rarer that they are granted."

*U.S. v. Douglas*, No. 02-80863, 2006 U.S. Dist. LEXIS 90035, at *12-13 (E.D. Mich. Dec. 13, 2006) (*quoting* 3 Charles Alan Wright, et al., *Federal Practice and Procedure*, § 571 (3d ed. 2004)).

Defendant claims the federal government has no jurisdiction to enforce a specific pretreatment process that is not explicitly required under federal law. Defendant points out that the EPA "promulgates discharge limitations that correspond to the application of the identified technology but does not require dischargers to install that technology." (Def.'s Br. II at 4 (*quoting National Wildlife Federation v. EPA*, 286 F.3d 554, 558 (D.C. Cir. 2002)).)

According to Defendant's reasoning, the multi-step pretreatment program prescribed in its discharge permit was created by DWSD, and is not federally mandated; accordingly, under federal law, CESI may lawfully bypass any step of the process, as long as final discharges contain less than the threshold amounts of waste promulgated by the EPA. Thus, Defendant concludes, the federal government has no jurisdiction under the Clean Water Act to prosecute a bypass of the pretreatment program unless such bypass results in discharges in excess of EPA limitations.

The Court disagrees with Defendant's analysis. The Clean Water Act explicitly preserves federal authority to prosecute knowing violations of "*any* requirement imposed in a pretreatment program approved under [§ 1342(b)(8)]." 33 U.S.C. § 1319(c)(2)(A) (emphasis added). In granting CESI's discharge permit, DWSD acted

6

pursuant to its authority under Michigan's EPA-approved NPDES program, and, therefore, the pretreatment program itself is one "approved under" § 1342(b)(8).

Furthermore, CESI's discharge permit prohibits bypassing any step of the pretreatment program without giving notice to DWSD. (Gov't Ex. 1.04 at 13-14.) Federal and local regulations define a bypass as the "intentional diversion of wastestreams from *any portion* of an Industrial User's treatment facility." 40 C.F.R. 403.17(a)(1); Detroit City Code § 56-3-58.1(a) (emphasis added). A bypass is permissible if it does not cause a violation of pretreatment standards or requirements, but even then, "only if it also is for essential maintenance to assure efficient operation." 40 C.F.R. 403.17(b); Detroit City Code § 56-3-66.1(c). Otherwise, bypasses are illegal unless they are unavoidable, no alternatives exist, and prior notice is given to the appropriate authorities. 40 C.F.R. 403.17(d); Detroit City Code § 56-3-66.1(c)(3).

Defendant offers no legal precedent to support his claim that federal authorities may not prosecute private operators for not abiding by the pretreatment program established in a state-issued discharge permit. Since CESI's pretreatment program contained a bypass prohibition and was "approved under" § 1342(b)(8), the Court concludes that the federal government has jurisdiction to pursue knowing violations of CESI's discharge permit, as it did in this case.

### B. Count IV: Violation of the Clean Water Act – Tampering

Count IV alleges that, when DWSD officials installed a sampling device to monitor CESI's discharges, Defendant had employees dilute or replace the facility's wastewater discharge stream to give the impression that CESI was complying with pretreatment regulations. The Clean Water Act prohibits anyone from "knowingly

7

falsif[ying], tamper[ing] with, or render[ing] inaccurate any monitoring device or method required to be maintained under this Act."  33 U.S.C. § 1319(c)(4).

At trial, the Government presented testimony from two CESI employees that they filled tanks 14 and 15 with water from a nearby fire hydrant and, following Defendant's instructions, used this water as a substitute waste stream when DWSD officials visited the site.  A DWSD employee also testified that when visiting CESI, he was often made to wait for several minutes before he was allowed to inspect the sampler.

Defendant claims that, contrary to the Government's assertions, tanks 14 and 15 were filled with brine water, a legitimate waste stream which CESI accepted from its clients and was allowed to discharge by its permit.  Defendant argues that CESI had no obligation to discharge from a specific tank at any particular time; therefore, discharging brine water when DWSD was monitoring the facility did not amount to falsifying the sampling device or rendering it inaccurate.

Sufficient evidence was presented to support a finding that tanks 14 and 15 were filled with regular water from a fire hydrant, not with a legitimate alternative waste stream.  Furthermore, even assuming that tanks 14 and 15 were filled with brine water, for the monitoring process to function properly, it is necessary that samples be representative of the facility's discharges.  Therefore, a treatment facility may not deliberately alternate between waste streams to deceive government officials into believing it is complying with its permit.  To hold otherwise would render § 1319(c)(4) effectively unenforceable, short of proving that a defendant physically tampered with a monitoring device.  Finally, Defendant does not argue – and the evidence would not support the notion – that it was merely a matter of coincidence that CESI discharged

8

from tanks 14 and 15 when DWSD officials visited the site.

      **C.**    **Count V : False Statements**

This count charges Defendant with falsifying and directing a CESI employee to falsify wastewater discharge logs to reflect that the facility had not discharged on certain days, in violation of 18 U.S.C. §§ 1001 and 2. Defendant contends the Government did not provide enough evidence to prove (1) that the recordkeeping requirement arose under federal law; (2) that Defendant ordered someone else to make false log entries; and (3) that the logs' falsity was material to the EPA's decisions with regards to CESI. These arguments are unpersuasive.

Defendant argues the duty to maintain accurate logs was imposed by DWSD, not by a federal statute or regulation, and that the federal government cannot prosecute violations of municipal law. This is the same reasoning Defendant applied on Count Two, and it fails for the same reasons.

CESI's discharge permit stipulates that the facility may discharge up to 200,000 gallons per day, on weekdays only, and that it must maintain a record of all its discharges. (Gov't Ex. 1.04 at 2b, 3a, 3c.) The obligation to record discharges is a "requirement imposed in a pretreatment program approved under [§ 1342(b)(8)]," which federal agencies have the power to enforce. 33 U.S.C. § 1319(c)(2)(A). Furthermore, recording requirements are common among state-managed NPDES programs, all of which depend on EPA approval to become law. To place this rule beyond the federal government's jurisdiction would significantly reduce its ability to effectively enforce the Clean Water Act.

Defendant also argues that the Government failed to show that false statements

9

about discharge logs were made to EPA or MDEQ regulators, and thus prove these statements fell under EPA jurisdiction.  However, "[a] department or agency has jurisdiction . . . when it has the power to exercise authority in a particular situation." *U.S. v. Rodgers*, 466 U.S. 475, 479 (1984); *see also* 6th Cir. Crim. Pattern Jury Instruction 13.03(2)(D) (2007) & Committee Commentary.  Furthermore, "it is not necessary that the government prove that the statements were made directly to, or even received by, the United States government."  6th Cir. Crim. Pattern Jury Instruction 13.03(3).

Defendant also erroneously claims the Government did not provide sufficient evidence that he directed another CESI employee to falsify the discharge logs.  At trial, the Government presented David Stephenson, a former CESI employee whose duties included oil recovery and wastewater treatment.  Mr. Stephenson testified that at some point before June 17, 2002, the facility's discharge logs disappeared altogether, and Defendant asked him to recreate them "accurately."  Defendant contends no rational trier of fact could interpret the word "accurately" as directing Mr. Stephenson to falsify the discharge logs.  At trial, however, recounting the episode when he recreated the lost logs, the Court recalls that Mr. Stephenson said Defendant "had some kind of inspector or somebody coming in [and] was screaming to get it done as fast as possible." Furthermore, Mr. Stephenson stated that, on another occasion in the spring of 2002, Defendant explicitly asked him to alter the logs, or to have Christopher Gouran, another CESI employee, alter them.  Mr. Gouran testified and confirmed that Mr. Stephenson told him Defendant wanted the discharge logs altered.  A rational trier of fact could reasonably have concluded that Defendant intended for Mr. Stephenson to recreate the

10

discharge logs inaccurately.

Finally, Defendant contends the Government failed to provide evidence the logs were "material," meaning that they had a natural tendency or capability to influence the EPA's decision making.  *See U.S. v. Dedhia*, 134 F.3d 802, 806 (6th Cir. 1998) ("A statement is material if it has a natural tendency to influence a decision or function within the jurisdiction of a governmental agency") (*citing U.S. v. Gaudin*, 515 U.S. 506, 509 (1995)).  In particular, Defendant argues there was no testimony that any agency decision was, or could have been, affected by allegedly false discharge logs.  However, DWSD senior assistant chemical engineer William Burbidge testified that, as part of the enforcement process, DWSD officials occasionally reviewed discharge logs to monitor compliance with environmental laws and regulations.  A reasonable trier of fact could well have found the logs to be material, on grounds that an enforcement action would more likely be triggered if the logs indicated discharges in excess of CESI's permit, or on days when DWSD officials were told no discharges had occurred.

> **D.    Counts VI and VII: False Statements**

Counts VI and VII allege respectively that on March 6 and 15, 2002, Defendant had David Stephenson tell DWSD officials that CESI was not discharging, in order to prevent the collection of samples from the facility's wastewater discharge stream.  Causing material false statements to be made in a matter within the jurisdiction of a federal agency violates 18 U.S.C. §§ 1001 and 2.  The Court finds the Government's evidence sufficient to establish guilt beyond a reasonable doubt.

Mr. Stephenson testified that, at some point in the spring of 2002, he started placing a "tick" mark next to every entry which, to the best of his recollection, did not

11

accurately reflect CESI's discharges.  However, Defendant points out that neither the

March 6 or 15 entries bear such a "tick" mark: the log indicates 39,000 gallons were

discharged on March 6, and no discharges occurred on March 15.  (Gov't Ex. 9.18 at 8-

9.)  Defendant argues that the absence of "tick" marks means Mr. Stephenson did not

lie about CESI's activities on those days, and therefore a reasonable jury would not

have convicted him on Counts VI and VII.

        The jury could have reasonably found that Mr. Stephenson lied to DWSD officials

on March 6, even though the logs reflect a discharge for that day.  Defendant's

argument inaccurately describes Mr. Stephenson's trial testimony: Mr. Stephenson

testified his practice was to place "tick" marks next to falsified log entries, not when he

falsified the log *and also* made false statements to DWSD personnel.  Mr. Stephenson

also stated that Defendant at times instructed him to stop discharging if DWSD officials

came to the site, and tell them no discharges were ongoing.  This is sufficient evidence

from which to reasonably conclude that Mr. Stephenson lied to DWSD officials on

March 6, and did so at Defendant's behest.

        Furthermore, Mr. Stephenson's testimony was corroborated by Walter Blaney,

water systems investigator, and Houxiang Liu, assistant chemical engineer, both DWSD

employees.  Messrs. Liu and Blaney testified that they were frequently told when visiting

CESI that the faciility was not discharging.  In particular, Mr. Blaney testified that his

practice when visiting a pretreatment plant was to collect a "grab" sample of its

discharge, unless the facility was not discharging on that day.  Mr. Blaney stated that

when he visited CESI on March 6, Mr. Stephenson told him to wait, then asked him to

return an hour later, and finally informed him there was no discharge taking place

12

because the discharge pipe was blocked.

The jury's decision to convict Defendant on Count Seven was also reasonable. By itself, the absence of a "tick" mark next to the March 15 entry does not exculpate Defendant.  Mr. Stephenson admitted at trial that his record keeping was not always precise; therefore, he could have lied to DWSD on March 15 about an ongoing discharge, and later erroneously recorded that none had occurred.  The Government notes that the log entry for March 13 also states no discharge occurred on that day, but it bears a "tick" mark as well.  (Gov't Ex. 9.18 at 9.)  Since both entries sit two lines apart on the same page, a reasonable jury could conclude that Mr. Stephenson simply made a mistake when he placed his "tick" mark on March 13.  In any event, the Government need not "prove that the crime happened on that exact date" to sustain its burden, only that it happened "reasonably close" to the date charged.  6th Circuit Crim. Pattern Jury Instruction 2.04.  Furthermore, Mr. Blaney also testified that on March 14, he installed at CESI a device programmed to take multiple samples over a 24-hour period.  Mr. Blaney picked up his machine the next day, but once again he could not collect a grab sample because Mr. Stephenson told him the facility was not discharging.

The Court concludes that the jury had sufficient evidence to reasonably find Defendant guilty of false statements regarding discharges occurring on or about March 6 and 15, 2002.

### E.    Count VIII: False Statements

Count VIII accuses Defendant of making false statements in CESI's 2002 application to DWSD for a permit to discharge treated wastewater into the local sewer. The application listed Bryan Mallindine as the company's "authorized representative,"

13

the person who could certify that the information it contained was true, accurate and complete; however, it was signed "Michael Panyard on Behalf of B. Mallindine." (Gov't Ex. 1.06 at 1.) The application also stated that "pretreatment standards [were] being met on a consistent basis" at the facility. (*Id.* at 7.)

The Government argues that in signing the application while knowing CESI did not have adequate treatment capabilities, Defendant made a false statement in violation of 18 U.S.C. §§ 2 and 1001(a)(3), the latter of which makes it illegal for

> whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, [to] knowingly and willfully . . . mak[e] or us[e] any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry.

In challenging his conviction, Defendant argues that he cannot be liable for false statements contained in a document he explicitly signed "on behalf of" someone else, and that the application does not constitute a material statement because he was not CESI's "authorized representative."

Defendant's first argument is without merit. By its plain language, the statute applies to "whoever," that is *any* person who "knowingly and willfully" makes a false writing. This necessarily includes Defendant, since he signed the application himself, even if the application explicitly designated Mr. Mallindine as CESI's "authorized representative." A different rule would allow anyone intending to submit a fraudulent document to simply sign "on behalf of" someone else and transfer all liability to that person. Congress could not have intended this result.

Defendant also claims he was not qualified to serve as CESI's "authorized representative" and sign the application's certification statement; therefore, he argues,

14

the application was not a "material" document under § 1001(a)(3), because the EPA

and DWSD could not have used a document signed by an unauthorized person as the

basis for a decision.

The EPA requires that permit applications submitted by pretreatment facilities

under the Clean Water Act be signed by a "responsible corporate officer," defined as:

(i) a president, secretary, treasurer, or vice-president of the corporation in charge of a principal business function, or any other person who performs similar policy- or decision-making functions for the corporation, or

(ii) The manager of one or more manufacturing, production, or operating facilities, provided, the manager is authorized to make management decisions which govern the operation of the regulated facility including having the explicit or implicit duty of making major capital investment recommendations, and initiate and direct other comprehensive measures to assure long-term environmental compliance with environmental laws and regulations; can ensure that the necessary systems are established or actions taken to gather complete and accurate information for control mechanism requirements; and where authority to sign documents has been assigned or delegated to the manager in accordance with corporate procedures.

. . .

40 C.F.R. § 403.12(l)(1).  Several courts also hold that

Under the [Clean Water Act], a person is a "responsible corporate officer" if the person has authority to exercise control over the corporation's activity that is causing the discharges.  There is no requirement that the officer in fact exercise such authority or that the corporation expressly vest a duty in the officer to oversee the activity.

*U.S. v. Iverson*, 162 F.3d 1015, 1025 (9th Cir. 1998); *see also U.S. v. Hansen*, 262 F.3d

1217, 1251 (11th Cir. 2001) (same); *U.S. v. Hong*, 242 F.3d 528, 531 (4th Cir. 2001)

("The gravamen of liability as a responsible corporate officer is not one's corporate title

or lack thereof; rather, the pertinent question is whether the defendant bore such a

relationship to the corporation that it is appropriate to hold him criminally liable for failing

15

to prevent the charged violations of the [Clean Water Act].").

The Government argues that Defendant's position and responsibilities as CESI's head of sales and environmental compliance qualify him as a "responsible corporate officer" according to EPA regulations. The Court agrees. The Government presented evidence that Defendant recommended investing in certain wastewater treatment systems to increase the facility's treatment capabilities, (Gov't Ex. 3.04), and that he ordered untreated wastewater discharged into the sewer to make room for new shipments from clients. This was sufficient to show that Defendant was a responsible corporate officer within the ambit of 40 C.F.R. § 403.12(l)(1)(ii).

Furthermore, the jury had ample evidence from which to find that DWSD could readily have assumed Defendant had the authority to sign a permit application on Mr. Mallindine's behalf. Defendant worked for CESI and its predecessor, Rich Coast, Inc., for several years, before Mr. Mallindine joined the company. Even after Mr. Mallindine arrived, witnesses stated he was often not present, and that Defendant was in charge in his absence. As listed in the application, Defendant was DWSD's "contact person;" several witnesses testified Defendant represented CESI in its dealings with government agencies, handling correspondence with regulatory authorities and escorting officials when they conducted routine inspections. Finally, DWSD officials testified that, more often than not, Defendant was the person at CESI with whom they discussed matters of environmental compliance. From all of this, the jury could have reasonably inferred that the application was a material document under 18 U.S.C. § 1001(a)(3), in that it would have had a "natural tendency to influence a decision or function within [DWSD's] jurisdiction." *Dedhia*, 134 F.3d at 806.

16

### F.    Count X: False Statements

This count charges Defendant with making false statements in a June 2002 letter in which, responding to a DWSD inquiry into discharge exceedances at CESI, Defendant stated the exceedances were caused by a faulty aluminum sulfate pump which had since been repaired.  (Gov't Ex. 10.13.)  The Government alleges Defendant sent this letter to conceal the fact that little or no treatment was taking place at the facility at the time, thereby violating 18 U.S.C. §§ 1001 and 2.

Defendant argues he had no direct knowledge of what caused the exceedances in question, and that he relied on others, particularly CESI's chemist, Charles Leen, for his information on the matter.  Defendant notes that a similar letter, sent to DWSD in November 2001, was drafted by Mr. Leen and signed by CESI employee Sommer Ellison.  (Def.'s Ex. 538.)  He also points to Mr. Leen's testimony that he was the person Defendant and other employees consulted when a machine malfunctioned.

Defendant's arguments concerning the November 2001 letter are irrelevant to this count, which specifically concerns the letter he sent in June 2002.  Defendant does not claim to have been informed of the allegedly deficient aluminum sulfate pump by Mr. Leen, nor was any evidence to that effect presented at trial.  Furthermore, several witnesses testified that little or no treatment of any kind was actually taking place at the time, and that in meetings the phrase "no 'T' in the 'TSD'" – meaning no "Treatment" in "Treatment, Storage and Disposal" – was often used to describe the facility's lack of treatment capability.  Considering all the evidence before it, the jury acted reasonably in convicting Defendant on Count X.

### G.    Count XII: False Statements

17

Count XII charges Defendant with making false statements to EPA agents during the June 17, 2002 raid, in violation of 18 U.S.C. §§ 1001 and 2.  Defendant's objection reiterates his argument under Count II, that because the treatment process used at CESI was not mandated by federal law, statements he made about the facility's treatment capabilities were not material representations concerning a matter within the EPA's jurisdiction.  The Court has already held that the EPA had the authority to investigate CESI's failure to adhere to the treatment procedures prescribed in its discharge permit.  Because there is no reasonable doubt that Defendant's July 17 statements were material to this investigation, his motion on Count XII is denied.

### H.    Count I: Conspiracy

The first count of the indictment charges Defendant of violating 18 U.S.C. § 371 (conspiracy to commit offense or to defraud United States) by conspiring to (1) violate the Clean Water Act; (2) render inaccurate monitoring devices and methods; (3) make false statements; and (4) obstruct justice.  The Court concludes there was sufficient evidence to convict Defendant on all four objects of the conspiracy beyond a reasonable doubt.

On a § 371 conspiracy charge, the Government must prove "(1) an agreement to accomplish an illegal objective against the United States; (2) one or more overt acts in furtherance of the illegal purpose; and (3) the intent to commit the substantive offense, i.e., to defraud the United States."  *U.S. v. Douglas*, 398 F.3d 407, 413 (6th Cir. 2005).

As to the first object, violating the Clean Water Act, Defendant simply restates his contention that failing to abide by pretreatment procedures specified in CESI's discharge permit was not illegal under the Clean Water Act, and therefore he could not

18

have conspired to violate federal law.  The Court considered and rejected this argument as to Count II; furthermore, the Government presented sufficient evidence for the jury to find that Defendant acted in concert with others in bypassing CESI's pretreatment program and discharging wastewater directly into the local sewer system.

Regarding the second and third objects, Defendant contends there was not enough evidence to convict him on each substantive count; therefore, he argues the Government failed to prove beyond a reasonable doubt that an overt act occurred in furtherance of any illegal purpose.  As discussed above, the Court concludes the evidence was sufficient to support Defendant's conviction for rendering inaccurate a monitoring device or method (Count IV) and making false statements (Counts V-VII, X and XII); it follows that this evidence was also sufficient to prove overt acts in furtherance of a conspiracy on each of these counts.

Finally, Defendant claims that since his co-defendant Mr. Mallindine was acquitted of obstruction of justice charges, there is not sufficient evidence to sustain his conviction on the fourth object of the conspiracy.  Count XI of the indictment alleged that, in April 2002, after learning that authorities were investigating the release of oil into a local waterway, Mr. Mallindine had CESI employees build a cement pad over a drain which had been used to discharge wastewater illegally into the municipal sewer. Defendant argues that building the cement pad was the overt act for the fourth object of the conspiracy, and since the Government did not obtain Mr. Mallindine's conviction on Count XI, a jury could not reasonably find Defendant guilty of obstruction of justice.

Defendant is incorrect.  The indictment charged Defendant with obstructing justice by making false statements to investigators on the day of the raid, when he

19

claimed he had no knowledge of any bypasses of CESI's pretreatment process, of alterations to discharge logs, of untreated wastewater being discharged into the municipal sewer, and of the cement pad concealing the drain used for those discharges. The overt act of building the cement pad was charged only to Mr. Mallindine. Furthermore, the fact that the jury failed to convict Mr. Mallindine on Count XI does not mean the Government failed to prove that the cement pad was an overt act.  The Government supplied photographic evidence of the cement pad and testimony from Mr. Stephenson, who explained that the drain beneath it had been used to dump untreated wastewater into the sewer.  Along with the rest of the evidence presented, this was sufficient for a reasonable jury to find that Defendant knew of the cement pad and its purpose, and was untruthful in his statements to investigators on the day of the raid.

## IV.    CONCLUSION

Viewing the evidence in the light most favorable to the Government, the Court holds that the jury acted rationally and reasonably when it convicted Defendant on all counts against him.  *See Jackson*, 443 U.S. at 319.  Accordingly, Defendant's Motion for Judgment of Acquittal pursuant to Fed. R. Crim. P. 29 is **DENIED**.

**IT IS ORDERED.**

s/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  January 7, 2009

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on January 7, 2009.

s/Carol A. Pinegar
Deputy Clerk