UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                     Plaintiff,                CASE NUMBER: 07-20037-2
                                               HONORABLE VICTORIA A. ROBERTS

v.

MICHAEL G. PANYARD,

                     Defendant.

_____/

**MEMORANDUM OPINION**

## I.    INTRODUCTION

Defendant Michael Panyard comes before the Court to be sentenced for violating the Clean Water Act. Probation calculates his Guideline range to be 21 to 27 months, based on a Total Offense Level of 16 and a Criminal History Category of I. Neither party disputes Probation's Criminal History calculation.

The Government argues the Offense Level should be 18, with a range of 27-33 months. Defendant suggests a range of 6 to 12 months, and an Offense Level of 10.

The Court finds Defendant's Guideline range to be 27 to 33 months, based on a Total Offense Level of 18 and a Criminal History Category of I. However, due to Defendant's history, personal characteristics, and low risk of recidivism, the Court sentences him to 15 months detention.

## II.    BACKGROUND

Comprehensive Environmental Solutions, Inc. ("CESI") and its predecessor entity, Rich Coast, Inc. ("RCI"), own an industrial waste treatment, storage and disposal ("TSD") facility in Dearborn, Michigan. This "tank farm" operates under a permit from

the Detroit Water and Sewerage Department ("DWSD"), which requires that liquid wastes be treated according to a multi-step process aimed at removing oils and other industrial residue. Clients pay CESI to take their wastewater and reduce chemicals or other contaminants to acceptable levels, at which point the remaining water can be discharged legally into the municipal sewer for treatment by a publicly-owned treatment works ("POTW").

Defendant worked for RCI and CESI from about 1997 until 2005. He was hired as a janitor and rose through the ranks, becoming Environmental Coordinator and Sales Manager of RCI, and President, General Manager and Sales Manager of CESI.

On June 17, 2002, federal and state law enforcement agents raided CESI on suspicions that, over a period of about 14 months between 2001 and 2002, the facility dumped millions of gallons of untreated industrial liquid waste into the sewers. Defendant and two others, Bryan Mallindine and Charles Long, were indicted for violations of the Clean Water Act ("CWA").

In a first superseding indictment filed July 12, Defendant was charged with bypassing CWA pretreatment requirements, in violation of 33 U.S.C. § 1319(c)(2)(A) (Count II); rendering inaccurate DWSD monitoring devices or methods, in violation of 33 U.S.C. § 1319(c)(4) (Count IV); making false statements, in violation of 18 U.S.C. § 1001 (Counts V-VIII, X and XII); and conspiring to commit all the above, in violation of 18 U.S.C. § 371 (Count I). Violating CWA pretreatment requirements carries a sentence of imprisonment for up to three years, or up to $ 50,000 in fines per day of violation. 33 U.S.C. § 1319(c)(2). The sentence for CWA tampering is up to two years detention, or up to $ 50,000 in fines per day of violation. § 1319(c)(4). Each count of

false statements can yield up to five years detention, and up to $250,000 in fines.  18 U.S.C. § 1001.  Finally, conspiring to violate the CWA can be punished by up to five years in prison.  18 U.S.C. § 371.

In October 2008, during a three week jury trial, a number of witnesses testified that Defendant was aware of, condoned, and authorized illegal discharges of untreated wastes into the sanitary sewer.  Evidence showed Defendant knew CESI's tanks were full, that it could not accept more waste without discharging an equivalent amount, and that it did not have operable equipment with which to properly treat liquids already stored in its tanks.  However, Defendant signed a permit application certifying to DWSD that CESI was meeting pretreatment standards on a consistent basis, and the facility continued to accept millions of gallons of waste.  Former employees stated Defendant had them alter tank farm logs to conceal illegal discharges, and instructed them to continue discharging untreated waste over their objections, saying CESI would pay a fine if necessary.  Witnesses from regulatory agencies testified Defendant misled them on several occasions, stating that exceedances were temporary and due to machine problems, that CESI operated a cutting-edge facility, and that allegations of illegal dumping were fabrications by a disgruntled former employee.  Finally, the jury heard a taped exchange in which, on the day of the raid, Defendant arguably "coached" a witness on what to tell investigators, presumably to conceal the tank farm's illegal discharges.

On October 21, 2008, the jury convicted Defendant on all nine counts.

## III.  ANALYSIS

A sentencing court bears a statutory duty to fashion a sentence that is "sufficient,

3

but not greater than necessary," and which appropriately serves:

>     (A) to reflect the seriousness of the offense, to promote respect for the
>         law, and to provide just punishment for the offense;
>     (B) to afford adequate deterrence to criminal conduct;
>     (C) to protect the public from further crimes of the defendant; and
>     (D) to provide the defendant with needed educational or vocational
>         training, medical care, or other correctional treatment in the most
>         effective manner.

18 U.S.C. § 3553(a)(2).  The starting point of this analysis should always be the

sentence prescribed by the United States Sentencing Commission Guidelines

("U.S.S.G." or "the Guidelines").  *Gall v. United States*, 128 S. Ct. 586, 596 (2007) ("[A]

district court should begin all sentencing proceedings by correctly calculating the

applicable Guidelines range") (*citing Rita v. United States*, 127 S. Ct. 2456, 2480

(2007)).  However, the court may not limit its analysis to the Guidelines; indeed, it "may

not presume that the Guidelines range is reasonable."  *Gall*, 128 S. Ct. at 596.  Rather,

before rendering its decision, the court must consider all the factors enumerated in 18

U.S.C. § 3553(a) to determine if they warrant adjusting the sentence.  *United States v.

Booker*, 543 U.S. 220, 245-46 (2005).   In doing so, the court must consider any

argument made by the defendant to reduce his or her sentence:

>     When a defendant raises a particular argument in seeking a lower
>     sentence, the record must reflect both that the district judge considered
>     the defendant's argument and that the judge explained the basis for
>     rejecting it.  After considering such arguments, the district judge cannot
>     simply rely upon the advisory Guidelines range, but rather "must make an
>     individualized assessment based on the facts presented."  Finally, the
>     district judge "must adequately explain the chosen sentence to allow for
>     meaningful appellate review and to promote the perception of fair
>     sentencing."

*United States v. Lalonde*, 509 F.3d 750, 770 (6th Cir. 2007) (*quoting Gall*, 128 S. Ct. at

597) (other quotations omitted).

A sentence rendered by a district court must be both procedurally and substantively reasonable.  *Gall*, 128 S. Ct. at 597.  The court commits procedural error if it ignores or incorrectly calculates the Guidelines range, treats the Guidelines as mandatory, disregards the relevant § 3553(a) factors, relies on clearly erroneous facts, or fails to adequately explain its reasons for choosing a particular sentence or deviating from the Guidelines range.  *Id.*; *see also United States v. Dexta*, 470 F.3d 612, 614-15 (6th Cir. 2006) ("[A] sentence is procedurally reasonable if the . . . court addressed the relevant factors in reaching its conclusion.  . . . [P]rocedural reasonableness . . . does not depend on a district court's engaging in a rote listing or some other ritualistic incantation of the relevant § 3553(a) factors") (internal citations omitted).  By contrast, "[a] sentence is substantively unreasonable if the district court 'selects the sentence arbitrarily, bases the sentence on impermissible factors, fails to consider pertinent § 3553(a) factors or gives an unreasonable amount of weight to any pertinent factor.'" *United States v. Husein*, 478 F.3d 318, 332 (6th Cir. 2007) (*quoting United States v. Caver*, 470 F.3d 220, 248 (6th Cir. 2006)).

On appeal, sentences are reviewed for abuse of discretion.  *Gall*, 128 S. Ct. at 594 (*citing Booker*, 543 U.S. at 260-62).  In the Sixth Circuit, sentences within the Guidelines range are presumptively reasonable on review.  *United States v. Richardson*, 437 F.3d 550, 553 (6th Cir. 2006); *see also Rita*, 127 S. Ct. at 2462, 2467 (holding that appeals courts may apply a presumption of reasonableness to sentences within the Guidelines, but that sentences outside the range are not presumptively unreasonable).  However, "this rebuttable presumption does not relieve the sentencing court of its obligation to explain to the parties and the reviewing court its reasons for

5

imposing a particular sentence." *Richardson*, 437 F.3d at 554.  Finally, although *Booker* empowered district courts to practice "individualized sentencing within reason," *United States v. Vonner*, 516 F.3d 382, 392 (6th Cir. 2008), appellate courts maintain authority to review variances which inappropriately apply § 3553(a) factors.  *See United States v. Davis*, 537 F.3d 611, 618 (6th Cir. 2008).

### A.    Advisory Guidelines

Applying the 2008 edition of the Guidelines, Probation attributes to Defendant a total Offense Level of 16 and places him in Criminal History Category I, for a sentencing range of 21 to 27 months.

The Court begins by verifying that Probation's calculation is correct.  *See Gall*, 128 S. Ct. at 596.  The Court applies the 2008 edition of the Guidelines, as per U.S.S.G. § 1B1.11(a).

### 1.    Total Offense Level

### a.    Grouping of Offenses

Defendant was convicted of violating the CWA, conspiring to violate the CWA, tampering with DWSD monitoring devices, and making false statements.

Defendant's actions of bypassing CWA requirements and tampering with monitoring devices were part of a common scheme or plan, and must be considered as a group.  § 3D1.2(b).  The offense level applicable to the group is that of the most serious counts comprising it.  § 3D1.3(a).  Here, both counts have identical offense levels, so they are considered as a single offense for sentencing purposes.

### b.    Base Offense Level

6

Probation starts with a base offense level of 6; neither Defendant nor the Government disputes this.

The Guideline for Defendant's conspiracy offenses instructs courts to apply the base offense level and adjustments for the substantive offense.  U.S.S.G. § 2X1.1.  The Guideline which applies to CWA violations under 33 U.S.C. § 1319(c)(2)(A) is U.S.S.G. § 2Q1.3, which prescribes a base offense level of 6.

### c.   Special Characteristics of the Offense

Probation calculates that the special characteristics of Defendant's crime increase his offense level by 8 points.  Defendant argues only 4 points should be added.

Because the offense involved discharges in violation of a permit, the Guidelines add 4 points to Defendant's base offense level.  § 2Q1.3(b)(4).  Defendant does not object to this enhancement, which raises his Offense Level to 10.

Under the Guidelines, the Court must add 6 points if the offense resulted in "an ongoing, continuous or repetitive discharge . . . *into the environment*."  § 2Q1.3(b)(1)(A) (emphasis added).  The Application Note which accompanies § 2Q1.3 explains the Sentencing Commission's thinking and informs on how to apply the Guideline:

> Subsection (b)(1) assumes a discharge or emission *into the environment resulting in actual environmental contamination.*  A wide range of conduct, involving the handling of different quantities of materials with widely differing propensities, potentially is covered.  *Depending upon the harm resulting from the emission, release or discharge, the quantity and nature of the substance or pollutant, the duration of the offense and the risk associated with the violation, a departure of up to two levels in either direction from that prescribed in these specific offense characteristics may be appropriate.*

§ 2Q1.3 cmt. n.4 (emphasis added).  The Sentencing Commission's commentary is "authoritative unless it violates the Constitution or a federal statute, or is inconsistent

with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993).

Defendant argues § 2Q1.3(b)(1)(A) should not apply, because: (1) CESI's untreated wastewater was pumped directly into the municipal sewer, and thus there was no discharge "into the environment;" and (2) even if the sewer is considered the environment, the Government did not provide proof of "actual contamination."

The Court considered and rejected these arguments when it sentenced the other individuals implicated in this case. Defendant's reading of § 2Q1.3 and its Application Note may be literally correct, but it does not square with the overall spirit of the Guideline. In drafting § 2Q1.3, the Sentencing Commission clearly recognized that the terms "discharge" and "emission" cover a broad range of actions, which may cause harm in a number of ways, and to varying degrees. The lack of recorded damage to the environment does not mean that other entities were not harmed, like the POTW that eventually processed CESI's discharges, for example. It is not unreasonable to surmise that the influx of oily wastewater created an additional burden on that facility, perhaps slowing the treatment process, consuming more chemicals, or causing filters to clog and require faster replacement. Naturally, the costs of these inefficiencies would be borne by the public. The fact that the Guidelines do not expressly address the case of a defendant who dumps waste into the processing stream of another treatment facility does not mean the Guidelines don't apply.

Furthermore, at least one circuit holds that proof of actual contamination is not required to apply § 2Q1.3(b)(1). *See United States v. Perez*, 366 F.3d 1178, 1182-83 (11th Cir. 2004). A few other courts consider the term "environment" to include POTWs.

8

*See United States v. Van Loben Sels*, 198 F.3d 1161, 1167 (9th Cir. 1999); *United States v. Spain*, No. 06 CR 545, 2008 U.S. Dist. LEXIS 103692, at *12 (N.D. Ill. Dec. 16, 2008) (unpublished).  For the same reasons, Defendant's argument against applying § 2Q1.3(b)(1)(A) must be rejected.

Nevertheless, pursuant to Application Note 4, the Court adds only 4 points to Defendant's Offense Level, instead of the maximum of 6.  A deduction of 2 points is appropriate because CESI processed non-hazardous materials, and discharged wastes were eventually treated by a POTW, thus reducing overall harm to the environment.

The Court applied the same 4-level enhancement when sentencing cooperating witness Donald Kaniowski and co-defendants Mallindine and Long, all of whom pled guilty or were convicted of discharging the same materials as Defendant.  The Government withdrew its objection to the 2-point reduction so that Defendant's sentence would be consistent with those of Messrs. Kaniowski, Long and Mallindine.  *See* 18 U.S.C. § 3553(a)(6) (sentencing courts must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct").

A 4-level increase is appropriate under § 2Q1.3(b)(1)(A), bringing Defendant's Offense Level to 14.

### d.    Obstruction of Justice

Defendant was convicted of providing false statements and impeding the administration of justice with regard to his underlying offense of bypassing CWA requirements.  Under the Guidelines, a 2-level enhancement applies when:

(A) the defendant willfully obstructed or impeded, or attempted to obstruct

9

> or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense . . .

U.S.S.G. § 3C1.1.  Furthermore, in cases where a defendant is convicted of an obstruction offense relating to another, underlying offense,

> the count for the obstruction offense will be grouped with the count for the underlying offense under subsection (c) of § 3D1.2 (Groups of Closely Related Counts).  The offense level for that group of closely related counts will be the offense level for the underlying offense increased by the 2-level adjustment specified by this section, or the offense level for the obstruction offense, whichever is greater.

*Id.* at cmt. n.8.

The Application Notes to § 3C1.1 provide several examples of conduct to which the obstruction enhancement may apply, including:

> (g)    providing a materially false statement to a law enforcement officer that *significantly* obstructed or impeded the official investigation or prosecution of the instant offense;
> . . .
> (i)  other conduct prohibited by obstruction of justice provisions under Title 18, United States Code (e.g., 18 U.S.C. §§ 1510, 1511); . . .

*Id.* at cmt. n.4 (emphasis added).

Defendant contends the obstruction enhancement is not applicable, because his statements to law enforcement officers did not "significantly" obstruct the investigation into CESI's unlawful discharges.

Only one claim deals with statements to law enforcement officials: Count XII alleges Defendant told agents for the Environmental Protection Agency that he had no knowledge of: (1) bypasses of treatment processes at CESI; (2) hoses run from tanks to manholes; (3) alterations to tank farm logs; or (4) cement placed over a floor drain in the

10

drum processing building.  These allegations relate to a conversation Defendant had with Agent Carol Paszkiewicz on the day of the raid, to which Agent Paszkiewicz testified at trial.

Defendant argues his statements did not "significantly" obstruct the investigation because the Government conducted a thorough investigation before executing the search warrant, and Agent Paszkiewicz testified she did not believe Defendant when he denied knowledge of illegal activities at CESI.

The Government responds that if Defendant had been truthful, it would not have been necessary to investigate and prove many facts presented at trial; furthermore, the Government argues, the fact that investigators did not believe Defendant at the time does not mean his statements did not impede the investigation.  Neither side cites case law in support.

The Court need not decide if Defendant's statements "significantly" hindered the investigation, because the § 3C1.1 enhancement is applicable under two other theories. First, pursuant to Application Note 4(i), the enhancement applies to "any conduct prohibited by obstruction of justice provisions under [Title 18]," and Defendant was convicted on six counts of making false statements in violation of 18 U.S.C. § 1001.

Defendant notes that Application Note 4(i) specifically references 18 U.S.C. §§ 1510 and 1511, two offenses listed in Chapter 73, the "Obstruction of Justice" chapter of Title 18.  According to Defendant, obstruction of justice offenses require affirmative physical conduct, and false statements do not qualify as physical conduct.  Thus, he argues, his actions were not sufficient to trigger § 3C1.1.

This arguments fails.  As the Government points out, the Sixth Circuit makes no

11

distinction between physical and oral conduct for purposes of § 3C1.1.  In *United States v. Davist*, a defendant was convicted of making false claims against the United States and making false statements under § 1001; he appealed the sentencing court's decision to add 2 points to his offense level under § 3C1.1.  481 F.3d 425, 426 (6th Cir. 2007). Reviewing § 3C1.1, the Sixth Circuit stated:

> Perhaps more important than the Guidelines provision itself is Application Note 4, which indicates that the § 3C1.1 enhancement is to apply 'to any other obstructive conduct in respect to the official investigation, prosecution, or sentencing of the instant offense *where there is a separate count of conviction for such conduct.*'

*Id.* at 427 (*quoting* U.S.S.G. § 3C1.1 cmt. n.4) (emphasis in *Davist*).  The court agreed with other circuits that a 2-level enhancement is proper when a defendant is convicted of a separate count for obstructive conduct.  *Id.* at 427 (citing cases).

The second theory of application for § 3C1.1 arises under *United States v. August*, 984 F.2d 705 (6th Cir. 1992).  In *August*, the appellant was a doctor convicted of improperly dispensing Schedule III drugs and failing to maintain proper records regarding his inventory of controlled substances.  *Id.* at 708.  The Sixth Circuit held that by making false statements to DEA agents after they began their investigation, falsifying records, and falsely telling the Michigan Department of Licensing that he administered most of the drugs to his patients, the defendant obstructed justice within the meaning of § 3C1.1, and applied the 2-level enhancement.  *Id.* at 714.

Defendant was convicted of false statements under: (1) Count V, for falsifying discharge logs; (2) Count VIII, for applying for an industrial wastewater discharge permit in which he certified that "pretreatment standards [were] being met on a consistent basis" at CESI; and (3) Count X, for telling DWSD officials that discharge exceedances

12

reported in May 2002 were due to a faulty aluminum sulfate pump.  The Government submits that, under *August*, this conduct, which spanned many months and misled regulators, is sufficient to trigger § 3C1.1.

Aside from the fact that they were prosecuted under a different set of laws, there is little difference between Defendant's actions and the conduct in *August*, particularly where falsifying records and lying to regulatory authorities are concerned.  In all likelihood, the Sixth Circuit would uphold a 2-level enhancement.

Even if Defendant's statements to Agent Paszkiewicz do not fit within the definition of § 3C1.1 cmt. n.4(g), under *Davist* and *August*, his other violations of 18 U.S.C. § 1001 justify increasing his Offense Level by 2 points, to level 16.

### e.   Aggravating Role

The Government contends that Defendant exercised a leadership role, and thus his offense level should be raised by at least 2 points.  Probation declined to apply the enhancement, because it was not levied against Messrs. Long and Mallindine, even though they also held managerial titles at CESI and supervised others not under Defendant's direction.

In calculating a defendant's Total Offense Level, the Guidelines consider the degree of leadership s/he exercised in the commission of the crime:

(a)   If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

(b)   If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

(c)   If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase

13

by 2 levels.

U.S.S.G. § 3B1.1.

For the enhancement to apply, the defendant must have "exerted control over at least one individual within a criminal organization." *United States v. Gort-Didonato*, 109 F.3d 318, 322 (6th Cir. 1997).

The Government contends Defendant's conduct qualifies at least for a 2-level enhancement under § 3B1.1(c), and arguably for a 3-level increase under § 3B1.1(b), because: (1) he held various management positions which placed him at or near the top of CESI's administrative hierarchy; (2) he authorized others to discharge untreated wastes; and (3) there were at least four other participants in addition to Defendant, including: Messrs. Kaniowski and Long, as well as David Stephenson and Chris Gouran, both of whom testified at trial.

Defendant claims he did not organize, lead, manage or supervise any plant workers. He argues workers were overseen by Mr. Kaniowski, in his capacity as plant manager, and that Mr. Kaniowski reported to Mr. Mallindine. Defendant claims he only supervised CESI's sales staff, none of whom was implicated in the conspiracy.

Evidence at trial showed that Defendant exercised leadership in organizing or supervising illegal discharges at RCI and CESI. Mr. Kaniowski testified that when he complained about the facility's inability to treat incoming wastes, Defendant responded that clients were "valued customers and [CESI was] in the business to make money." (Tr. Oct. 6, 2008, at 116.) Mr. Kaniowski stated on another occasion, he and Mr. Stephenson became uncomfortable with the color of untreated wastewater they were discharging. They took a sample to Defendant, who told them CESI was not "regulated

14

on color or turbidity . . . [a]nd that if there was exceedance we would pay a fine, and that we should go back and continue to discharge to make room for incoming waste." (*Id.* at 142.)  Mr. Stephenson testified Defendant told him to have Mr. Gouran alter tank farm logs, but that Mr. Gouran refused.  (Tr. Oct. 9, 2008, at 104-05.)  Mr. Stephenson testified the logs went missing at some point, and that Defendant ordered him to reconstruct them from memory before an inspection by DWSD.  (*Id.* at 93-94.)  Mr. Stephenson also stated he repeatedly altered the logs at Defendant's request, to conceal illegal discharges on days when regulatory agencies came to visit the site.  (*Id.* at 94-98.)  Finally, Mr. Gouran testified he discharged untreated wastewater to make room for incoming waste, and that he told Mr. Stephenson he would not alter the tank farm logs.  (Tr. Oct. 7, 2008, at 144-47, 157-58.)

While there is clear evidence that Defendant had some leadership role over the operation, it is more difficult to establish the extent of his leadership, and whether his conduct merits an enhancement of 2, 3 or 4 levels.  According to the Guidelines, in deciding whether a defendant was a leader or organizer, as opposed to a manager or supervisor, courts should consider factors such as:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.  . . .

U.S.S.G. § 3B1.1 cmt. n.4.

As Probation notes, there is no evidence Defendant recruited others or enjoyed a larger share of the fruits of the crime; what the "fruits" were, is debatable.  While there is ample proof Defendant ordered or approved of discharges, evidence that he planned or

15

organized the overall offense is limited.

The Court finds that Defendant's leadership role warrants a 2-level increase under § 3B1.1(c).  Defendant's Total Offense Level is 18.

### 2.    Criminal History Category

Defendant's only prior conviction was for careless driving in 1980, when he was 18 years old.  Because it occurred outside the applicable time period, this conviction is not factored into Defendant's Criminal History Category determination.  § 4A1.2(e)(3). Therefore, Defendant's Criminal History Category is I; neither he nor the Government disputes this.

### 3.    Guideline Sentencing Range

Defendant's Total Offense Level is 18, and his Criminal History Category is I. The corresponding sentencing range under the Guidelines is from 27 to 33 months.

### B.    Factors Supporting Departure or Variance

The term "departure" refers to the case in which "a court reaches a sentence above or below the recommended Guidelines range through application of Chapters Four or Five of the Sentencing Guidelines."  *U.S. v. Atencio*, 476 F.3d 1099, 1101 n.1 (10th Cir. 2007).  By contrast, a variance occurs "[w]hen a court enhances or detracts from the recommended range through application of [18 U.S.C.] § 3553(a) factors."  *Id.*

To determine whether and to what extent a variance is appropriate, the sentencing court must apply a myriad of factors to the particular circumstances of each case, including:

> the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence to reflect the

16

> seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences available; the Guidelines sentencing range; any pertinent policy statement by the Sentencing Commission; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.

*United States v. Mayberry*, 540 F.3d 506, 518 (6th Cir. 2008) (*citing* 18 U.S.C. § 3553(a)).  The sentencing court need not expressly state each factor at sentencing, as long as its opinion reflects their consideration.  *Id.* (*citing United States v. Moon*, 513 F.3d 527, 539 (6th Cir. 2008)).

Defendant submitted a detailed sentencing memorandum, to which the Government responded.  Defendant requests a variance based on the following § 3553(a) factors.

### 1.    Defendant's Personal Characteristics

Defendant comes from a family of three children, and appears to maintain close contact with his parents and siblings.  He has a 25 year-old son from his first marriage, and two children, ages eight and 12, with his current wife.

### a.    Military Service and Employment History

Defendant's family has a history of military service, and he continued the tradition: he served on a destroyer during the first Gulf War and was granted Top Secret clearance by the Navy.  Defendant received several awards for his service, and a cousin serving as a major in the Marine Corps wrote a character letter on his behalf.

Courts may consider a defendant's military service and honorable discharge as

17

factors supporting a variance under § 3553(a).  *See Kimbrough v. United States*, 128 S.

Ct. 558, 575 (2007) (noting with approval that the district court factored a defendant's

military service, honorable discharge and steady history of employment in granting a

variance).  *See also United States v. Howe*, 543 F.3d 128, 139 (3d Cir. 2008)

("*Kimbrough* makes clear that [military service] may be considered as one of the

factors."); *United States v. Lamoreaux*, 422 F.3d 750, 756 (8th Cir. 2005) (approving of

the consideration of prior military service as a non-Guideline sentencing factor).

  Defendant has been unemployed since his arrest, and is currently the primary

caregiver for his two minor children; his wife is the family's sole financial provider.

Defendant cites this as a factor to consider in determining his sentence.

  In a pre-*Booker* ruling, the Supreme Court held that while a defendant's

socioeconomic status cannot factor into that person's sentence, a court is not

categorically precluded from considering the effects of a conviction on the defendant's

career.  *Koon v. United States*, 518 U.S. 81, 110 (1996).  However, the Court held loss

of employment could not be considered under the particular facts of *Koon*, stating: "it is

not unusual for a public official who is convicted of using his governmental authority to

violate a person's rights to lose his or her job and to be barred from future work in that

field."  *Id.*

  Post-*Booker*, the Court may consider Defendant's loss of work, due to his

conviction, for sentencing purposes.  However, it is probably "not unusual" for an

individual convicted of violating the CWA to have difficulty finding work in that field.

Furthermore, even though Defendant is unemployed, with his wife's salary, the

household has a negative monthly cash flow of only $190.00.

Defendant's military service and, to a limited extent, his lack of employment, lend moderate support for a variance.

### b.   Character Letters

Over 25 people wrote to attest to Defendant's character and request clemency on his behalf.  Writers include his wife, parents and siblings, his extended family, neighbors, a former client, and multiple sisters-in-law.

The portrait of Defendant which emerges from these letters is fairly remarkable. His family credits him almost single-handedly for turning his nephew from a problem child into a military graduate and successful college student.  There are several accounts of Defendant befriending an elderly neighbor, helping her stay in her house instead of going into a retirement home, buying Christmas gifts for a single mother with a drug problem, and always cooking for everyone.  There is also a touching story of Defendant contacting his aunt's estranged children by telephone from the hospital where she lay dying, so they could bid their mother a final farewell.  Many writers refer to Defendant as their "mentor," "second father," or as their "hero."  He seems, in many ways, like "one of the major links that holds [the] family together."  (Def.'s Sent. Mem. Ex. J (Letter of Diane Corey Pearsall, Defendant's Sister-in-Law).)

Defendant's acts of kindness, generosity and good deeds appear to span years. It seems that his sentence will greatly affect many who have come to rely or depend on him.  This factor supports a variance.

### 2.   Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment

Defendant posits that the punishment he has already endured, losing his career

19

and reputation, and the consequences for his family and social life, go a long way to constituting proper punishment, and also reflect the seriousness of his offense.

The Government disagrees and suggests that, even now, Defendant does not feel remorse or contrition for his actions. The Government points to Defendant's statement to the Court, in which he essentially accuses Mr. Stephenson of being the real criminal, fooling him and the Government, and concludes "I couldn't let it all end without telling [the Court] that I was never aware of any illegal activity nor of a conspiracy to do so." (Def.'s Sent. Mem. Ex. A.) According to the Government, contrary to his statements, Defendant does not accept responsibility for his actions, and believes the whole case to be a miscarriage of justice. Notably, Defendant's offense level does not credit him with acceptance of responsibility.

The Court will not re-try the case based on Defendant's letter, nor second-guess the jury's decision to find him guilty on all counts. Nor can the Court hold Defendant's belief in his innocence, assuming it is genuine, against him.

The Court does focus on Defendant's conviction on nine felony counts, all serious. Trial evidence showed that Defendant: (1) ordered or condoned discharging untreated wastes in violation of CESI's permit; (2) knew such discharges were illegal and could have criminal implications; (3) acted to conceal CESI's discharges from DWSD and other regulatory authorities; and (4) made repeated false statements to regulatory authorities and investigators. Next to Mr. Mallindine, Defendant was also the senior-most employee at CESI, and when Mr. Mallindine was not there, he was arguably the highest authority on-site.

On the other hand, as Defendant submits, he has already incurred serious

20

punishment for his actions: his career is in shambles, his family's finances have been significantly weakened, and he claims the stress caused him to develop diabetes. This assertion is not supported by any medical record. He has also lost standing in the community: he can no longer serve on his town's Planning Commission, or as director of the Tax Review Board; he cannot coach baseball anymore.

Under 18 U.S.C. § 3553(a), the Court may weigh these circumstances, but declines to do so.

### 3.    Need to Afford Adequate Deterrence

When applied to sentencing, the concept of deterrence has two components. The first deals with deterring crimes by individuals or entities similarly situated to the defendant; it favors exemplary sentences, so that one person's punishment may serve as a warning to others. The second aspect focuses on recidivism by the same defendant; it supports sentences tailored to individual circumstances and just severe enough to ensure that s/he will not commit other crimes in the future.

Defendant says the risk of recidivism in environmental crimes, and the likelihood that he will commit another crime like this in the future, are extremely low. He points out that for first-time offenders of his age, the recidivism rate is only 6.9%. *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* Ex. 9 (2004), *available at* http://www.ussc.gov/publicat/Recidivism_General.pdf. He also states that his conviction caused lasting damage to his reputation and career, and generally left him "a much humbler man."

The Court agrees Defendant poses a small risk of recidivism. However, the

21

Court must also consider another aspect of deterrence – discouraging people in similar positions from engaging in similar crimes.  This is a particular concern for environmental and white-collar crimes, because they are often perceived as carrying substantially lesser punishment than other comparable offenses.  *See United States v. Hagerman*, 525 F. Supp. 2d 1058, 1065 (S.D. Ind. 2007) ("The Sentencing Commission['s decision] to set higher guidelines for environmental offenses . . . was consistent with the general instructions from Congress to raise sentences for white-collar economic crimes, especially for purposes of deterrence.  *See* S. Rep. No. 98-225, at 76 (1983), as reprinted in 1984 U.S.C.C.A.N. 3182, 3259 (noting that 'major white collar criminals often are sentenced to small fines and little or no imprisonment,' creating the impression that 'certain offenses are punishable only by a small fine that can be written off as a cost of doing business')").

Defendant's cavalier attitude towards environmental regulations is troubling.  Mr. Kaniowski testified that, when he and Mr. Stephenson expressed discomfort with discharging certain materials, Defendant told them that if there was an exceedance, CESI would simply pay a fine.  This is precisely the kind of perception the Sentencing Commission meant to counteract, *see Hagerman*, 525 F. Supp. 2d at 1065, and the reason Congress instructed courts to factor deterrence into their sentencing decisions, 18 U.S.C. § 3553(a)(2)(B).

Still, this is Defendant's sentence the Court considers, not that of all other potential future offenders, and Defendant's very low personal likelihood of recidivism supports a reasonable variance.

### 4.      Need to Avoid Unwarranted Sentencing Disparities

22

Defendant submits that a lengthy prison term would be at odds with the sentence of his co-defendants and with the national averages for environmental crimes. Per congressional mandate, courts must try to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

Defendant asks the Court to bear in mind sentences imposed on Messrs. Mallindine and Kaniowski when sentencing him; however, neither was found guilty of the same conduct. Mr. Mallindine was convicted of one misdemeanor count of negligently bypassing CWA pretreatment requirements, but Defendant was convicted of nine serious felony counts. Mr. Kaniowski got three years probation for conduct which Defendant describes as "substantially similar" to his. Even if this is true, Mr. Kaniowski admitted his guilt and cooperated fully with the investigation, and the Government requested a downward departure at his sentencing. On the other hand, Defendant maintained his innocence throughout, and put the Government to its proofs. He cannot compare himself to a defendant whose assistance was so substantial the Government filed a U.S.S.G. § 5K1.1 motion on his behalf.

Defendant is also not similarly situated to Mr. Long, whom the Court sentenced to two years. Mr. Long was convicted on only two counts of violating and conspiring to violate the CWA. Also, Mr. Long had a much more extensive criminal history than Defendant.

Defendant argues that a two-year sentence would significantly exceed the average sentences for environmental crimes, and marshals several pages of statistics to prove his point. Among other facts, Defendant notes that in the Sixth Circuit, the ratio

23

of probation to detention sentences for environmental crimes increased regularly since

the Supreme Court's *Booker* decision, and that nationally, the median sentence for

environmental crimes was 13.5 months in 2006, six months in 2007, and 6 months in

2008.  Defendant also emphasizes that, in 2008, most defendants received sentences

either below or at the Guideline minimum, and no sentences above the Guidelines were

imposed.

The Government refutes Defendant's statistics, because they include both pleas

and jury verdicts, and cover a variety of environmental crimes other than those at issue

here.  Defendant responds that individuals convicted by a jury should not be punished

for exercising their right to a trial, and that the Court should consider these numbers,

since they are the only available sentencing data for environmental offenses.

The Court agrees that statistics can be useful to gauge trends in sentencing.

However, these numbers are too broad to be of much help.  Comparing Defendant's

conviction to amalgamated numbers for all environmental cases will not help the Court

achieve its mandate of "avoid[ing] unwarranted sentence disparities among defendants

*with similar records who have been found guilty of similar conduct*."  18 U.S.C. §

3553(a)(6) (emphasis added).

The Court is mindful that the majority of sentences, whether convictions or pleas,

involve probation rather than detention, and that only 26% of defendants were

sentenced within the Guidelines.  However, such reductions also contribute to the

perception that environmental crimes are not as serious as others, and are often lightly

punished.  *See Hagerman*, 525 F. Supp. 2d at 1065.

The Government likens this case – and Defendant seeks to distinguish it – from

24

three others.  In *Hagerman*, the president and principal owner of a wastewater treatment facility was convicted of ten counts of violating 33 U.S.C. § 1319(c)(4), and sentenced to 60 months in prison.  *Id.* at 1060.  As Defendant rightly points out, however, *Hagerman* involved toxic substances, and Mr. Hagerman also engaged in perjury, witness tampering and destruction of evidence.

Next, the Government cites *United States v. Weitzenhoff*, in which the general manager of a treatment facility was convicted of dumping waste activated sludge into the Pacific Ocean and received a 21-month sentence.  35 F.3d 1275 (9th Cir. 1994).  Defendant emphasizes the difference between discharging waste into the sewers, for future processing by a POTW, and directly into the ocean.  Defendant also notes that *Weitzenhoff* was decided before the Guidelines became advisory, and does not indicate whether the sentence was within the Guideline range.

Finally, in *United States v. Hong*, the owner and president of a treatment facility was convicted on 13 counts of negligently violating pretreatment requirements under 33 U.S.C. § 1319(c)(1)(A), and sentenced to 36 months imprisonment, a departure from the suggested Guideline range of 51 to 63 months.  242 F.3d 528, 529-30 (4th Cir. 2001).  Defendant argues *Hong* is inapposite, because his sentencing range is lower than Mr. Hong's.

Of all three, *Hong* bears the most resemblance to this case; however, it was decided before the Guidelines became advisory, and the reason for the departure is unexplained.  Furthermore, while sentencing decisions by other courts often have an advisory value, they are rarely so on-point as to provide a blueprint for sentencing another defendant; certainly, these cases do not rise to that level.

25

The Court believes its choice of sentence will avoid unwarranted disparities.

## IV.   CONCLUSION AND SENTENCE

After considering the factors brought to its attention by Defendant, the Court sentences him to 15 months of detention.  The Court believes that, in light of Defendant's history, personal characteristics and low risk of recidivism, this sentence is sufficient but not greater than necessary to meet the purposes set forth in 18 U.S.C. § 3553(a)(2).

**IT IS ORDERED.**


**S/Victoria A. Roberts**
**Victoria A. Roberts**
**United States District Judge**


**Dated:  April 23, 2009**

**The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on April 23, 2009.**

**s/Carol A. Pinegar**
**Deputy Clerk**

26